2-4-1-3-4-5 David Hieber v. Oakland County, MI et al. Arguments not to exceed 15 minutes per side. Mr. Kelly for appellant. Good morning, Your Honor. It's my pleasure to support Kevin Kelly on behalf of the appellant. I'd just like to jump into it and sort of bounce around a little on some of these claims here. But I wanted to start with the defamation. It's just the beginning. What's that? That's just a funny... Okay, bounce around. We're ready. Go. Okay, so I wanted to start with the defamation claim because I think it sort of puts it in perspective and sort of ties together the other claims. And, you know, the important thing is, I think, to realize what did they do here? What did Mr. Jen do? So you have the e-mail to the entire equalization team. They need to work from home. This is before he's been terminated, before he's had his fake watermill hearing. Did you say fake watermill? Yes, and I'll get to it. But the employees need to work from home. They have to go to a public parking lot. They have to enter through a door that is guarded by sheriff's deputies. They need to make sure there's a safe environment. And another e-mail to the entire department tells them they're to have no contact with Mr. Heber. Call 911 if you see him on site. Call 911 if you see him at home. Why doesn't qualified privilege bar the defamation claim? Because he made up these concerns. There was no real concern. Mr. Heber was a 25-year employee there with no disciplinary history. He had never threatened anyone. He didn't carry a gun on him. It sounded like he had a rifle rack on his truck. There's nothing suggesting that he would harm anyone. This is fabricated. Okay, well, there was fabricated. Wasn't there some allegations that he was a loose cannon, that he was, I don't remember the exact phrase, but kind of crazy, off the rails, or whatever it was? Sure, but this isn't some one-off situation. These are people that worked together for decades. I know, but weren't there some allegations like that, that he was kind of acting crazy or whatever? I don't know that there was any allegation that he was acting crazy. Well, whatever. I can quote you the phrases, but I think you know what I'm talking about, right? So, I mean, there were allegations about him, and, I mean, so there's a reaction to that. You say that's defamation, that they react to the allegations, even if they're unfounded allegations. Yes, because you look at the way that people actually interpreted this. You look at Mr. Parrish's email, Ms. Kermes' email. They believed what the statement was, was that Mr. Heber posed a physical threat. This isn't something, oh, well, hey, just maybe for out of abundance of caution, we're going to do this. They could have said that. They could have told them, hey, this is just precautionary. They didn't. How did people on the ground actually read those emails? They believed that Mr. Heber posed a physical threat. Why would you warn someone that he might show up at your home when you have nothing to suggest that he would do that, that he would engage in criminal activity? And maybe there's something, hey, there's something going on with him, or he's acting a little funny. That does not mean that you're going to trespass on somebody's home and pose a physical threat to them. So why didn't you bring in a DEA claim, A-D-E-A claim? Because we didn't feel we had to. And, frankly, I mean, this is an issue that is, I think, not necessarily in this case, but you can barely get an appointment. But isn't it easier than the constitutional claim? I mean, that's rational basis. A-D-E-A is. I mean, it's the same standards at the end of the day that apply. I mean, they apply the same burden-shifting analysis. I mean, the real fact is that you have to wait half a year before you bring a claim. And that's if you're lucky enough, because the process now is you can't just file a charge of discrimination with the EEOC. You have to wait to get an appointment with somebody and schedule it online. Well, during COVID and everything, good luck getting an appointment. I mean, there was a real concern about access to the EEOC during that time period. To be honest, I've stopped trying to file with the EEOC because it's such a timely and silly process at this point. I mean, you have to wait for a person to schedule an appointment with you before you can even file. It needs to be reformed. But the point is, I think, at the end of the day. For what it's worth category, I would rethink that. I mean, I'm just telling you, a lot of these civil rights statutes at the federal level are easier to get relief than the Constitution. I'm not saying it's 100%, but a lot of them are. So I'm not saying you're wrong about EEOC. If you're right, that seems really troubling. But I think there might be issues, too, with the ADA having a different standard of proof than what a 1983 claim would have. Different as in easier? No. In my opinion, I think they're harder. I think under some of the federal statutes, you have to prove sole cause, whereas under 1983, you don't. And so I think that's an easier standard. Do you have any evidence that these alleged defamatory statements were made with actual malice? Yeah, because, again, I think at the end of the day, the idea that he was going to go to someone's house, that he was going to present a physical threat, is fabricated. You can't jump from a concern that, hey, this guy's acting. The question is, do you have any evidence the statements were made with actual malice? Yes, because fabricating, creating false statements is evidence of actual malice. Oh, it itself is. Yes. You have nothing other than the statements were made, therefore they must have been made with actual malice because they were made. That's your argument? That's one point. I think actual malice requires a little bit more than that. Well, I cited case law that suggested that specifically says fabrication of evidence is evidence of actual malice. But I think you also need to look at their mindset and consider all the other things that they had to do. Because the question, I think that we have to say that the maker of the statement knew that these statements had not been, that the person who gave these warnings knew that these statements had not been made. I guess that's your argument, huh? Right. There's nothing to suggest, even if you take it at its worst, that, hey, this guy's acting funny. Or we have a concern about him. The statement's made that he was bipolar, that he was. . . Not true. I'm just trying to. . . I'm not saying they're not true. I'm just saying whether the person who made these warnings was advised of them. That's all. But I think you've got to remember, again, that this is his supervisor that made, that the person knew him. I don't think your defamation claim is your strongest claim. You might want to move on. Why did they send that email? Why did they do it? Because they're not doing that to every employee. This isn't some usual thing. And I think that goes back to the age and the political affiliation claim. And I think if you look at this, what is the argument against our age claim? You have all these statements from the highest-ranking HR official. We need to get rid of the dead wood, which is specifically tied to old-timers, older employees, members of the Patterson regime. You have them ignoring the statements, the complaints against Mr. Parris, who happens to be substantially younger. He makes a discriminatory comment towards bisexuals. He's not disciplined. There's no full-scale investigation where other people. . . Is there a difference in the volume of statements? No, because you go back to Mr. Parris' 2021 complaint. What's the allegation? He disparaged the DEI survey. One statement. All these other statements come about from the investigation. Well, if they would have investigated Mr. Parris, we know that other people would have complained about him, because we have Ms. Kermes' email that she submitted to the administration, specifically complaining about him, about how he's intimidating, all these things. So why didn't they investigate the two situations similarly? They didn't. And then they're going to come in and say, ah-ha, but we found more information because we treated him dissimilarly, and that justifies our disparate treatment. So Mr. Parris wasn't investigated? They're going to say they talked to him, but I don't call that an investigation. They didn't interview any other witnesses. They didn't do anything. I mean, what's the investigation there? What did they do? They say somebody testified. . . Do you remember a situation that you might have investigated? She said yes. And then we talk about the situation. There's no evidence of what she did to investigate that. Absolutely nothing. So you have that. And what's the big thing that they cite to? Well, they're not in the same position. Well, what's the relevance of that? They're both supervisors. It's a policy that applies universally to every employee. Can we shift to the Loudermill hearing? Yeah, because, and this is why I think it's fake, is because the individuals that are running the hearing clearly have a misunderstanding as to what a Loudermill hearing is. Tell me why. . . Well, let's put it this way. What is there in his termination letter, incidents mentioned in the termination letter that aren't mentioned in the first Loudermill interview? Not the one where they say, you know, this is not a time to dispute. This is the one where they tell them what the problems are. It didn't happen. So what are the things that are mentioned in the termination letter that are not mentioned there? I'm confused because there's only one Loudermill hearing. So just tell me what's not in complete overlap in terms of what's in the termination letter and what he's told before he's terminated. Nothing. The point is that he wasn't given a right to reply to anything. Chief Justice Sutton is referring to the interview that took place before. Oh, I'm sorry. The argument that the district court created for the defendant that when she was interviewed, when he was interviewed, he had no notice as to what the allegations were at that point. He hadn't gotten the letter putting him on notice that he was going to be terminated. He was just interviewed by somebody and had no idea what the allegations were against him, what the statements were. How is that notice? It's not. You can't give notice after the fact. So that's what happens. They go into the meeting. He gets interviewed by Corporation Counsel. Okay. What's going on? All he knows is he's on leave. So then he comes in and they give him the watermill hearing. This is now a couple days or a day before the watermill hearing. He gets the notice that they're going to terminate. Here's the summary of the investigation that doesn't identify any of the individuals who say he said these statements, which how can you rebut what some unknown person said? You don't even know who said it. Well, that's not true. That's all you can say. That completely interferes with his ability to reply to that. But more importantly, when he's given the opportunity to reply to the evidence after he's given the notice, he's specifically told, this is not your time to reply. This isn't your time to argue your case. You have it after the fact. And when they go in there and they say. Tell me what I'm missing here, but I thought the point of these informal hearings was that, yes, you could say that's not true. In other words, they tell you the five things you allegedly said, and you say, I don't know what you're talking about. You say so-and-so said this. Let me just tell you that person's hated me since day one. I never said it. It's very simple. I mean, they're saying you said something. You're the best evidence of whether you said it. But why isn't that appropriate? Is that all you're going to say? Why wouldn't I go in there and say, no, not only did I not say this, but this allegation is false. For instance, did Mr. Heber discipline somebody? Did he instruct somebody to discipline them? Oh, that would be really relevant about whether that person's telling the truth. Wouldn't you want to know that as employers? Is there any other information here besides your just bald denial as to making these statements? He's denied that opportunity because he doesn't know who made the statements. But more importantly, I think you've got to come back to it. When has he given his opportunity to say and explain himself? It's given after a termination. That doesn't cut it under the due process clause. Let's hear from the other side and you'll get your rebuttal. Thank you. May it please the Court. Good morning, Your Honors. Chris Trebillacock on behalf of Appalese, Oakland County, and individual defendant Kyle Jen. Simply having a different opinion or disagreeing with what certain facts mean does not create a genuine issue of material fact. And I think through the briefing and through oral argument I think here today, you can recognize that much of what appellant raises is simply a disagreement with what undisputed facts mean or should mean under the law. While we primarily rely on our briefing both below, before the trial court, as well as here, we think we've done a good job at addressing and pointing out the errors in the arguments made by appellants that are sort of much like how they open their oral arguments, scattershot and all over. We've done our best to gather those. But if I may just address four points that either the panel recognized or plaintiff appellant raised. One is on defamation. And Judge Mathis, I think you hit the nail on the head. Setting aside all the, whether there's implication by simply an employer being responsible, particularly in this day and age of how many workplace violence, we see shootings all the time, sending out after you terminate or put an employee on leave, advising employees that, look, this employee has been instructed. There's no dispute that Mr. Heber was instructed not to show up at work, not to contact employees about work information, not to show up at their homes. It is not unreasonable for an employer to say, if you see any of these things happen, let us know and call 911 because we want to keep everybody safe. That is what responsible employers do. I think that their argument is that there was an implication that he was somehow violent. And where's the support for that? I would point the court to testimony that was in the record, Exhibit 24, Exhibit 28, and Exhibit 26 of the brief below, that employees feared for their safety based on Mr. Heber's comments and conduct. I'd also point to the fact that Mr. Heber admits, and this is in his deposition transcript and in Lori Van Pelt, that admits that previously, it was well known, he followed an employee home on his own. He believed this woman that was working for him was having an affair with another employee, and he took it upon himself to follow her home and confront her. So that is the environment that these employees were working in, and those were relayed during the investigation, which is why they did it. There's also testimony and evidence that this was done in consultation with the security officer, Tim Sutherland, and we have attached his name in the record. This was done under the advice of Tim Sutherland, who was a security officer. Oh, and noteworthy, he was the personal protection guy for L. Brooks Patterson for all those years. So this isn't a guy who was out there looking to skewer Mr. Heber. It was done in consultation with county security in terms of what measures to take. So I think if you look at it, two things, Judge Mathis. One is, I think you're right, the qualified privilege, I think, kills that defamation claim and even assumes if you think there's any implication of defamatory intent, which I think is a huge stretch when you read those emails in context. And second, I think in terms of this malice, plaintiff didn't know or appellant didn't know nothing to establish or introduce any evidence that Mr. Jen held any ill will. As a matter of fact, the record below, which is cited, demonstrates that Mr. Heber admits that he had no issues and worked well with Mr. Jen prior to his termination. So I think that whole issue is really a fabrication and a stretch. And if these types of communications to employers could create a claim for potential defamation under these facts and circumstances, it would be a dangerous precedent for employers within the Sixth Circuit. Second note, I would say this appeal does present an opportunity for this panel to confirm that IDEA, in recognizing Congress' intent that IDEA preempts 1983 age claims, that IDEA is supposed to be the sole exclusive remedy for age claims, and joining the other circuits who have found that. Lower courts have recognized that this appeal does present that opportunity to confirm that. The lower court ducked it, didn't address it, but I think that this panel has an opportunity to do that. On the age discrimination, plaintiffs make a lot of noise about these comments attributed to April Lynch regarding Deadwood and Nimble Workforce and things like that. I would note that Ms. Lynch is not the decision-maker in this case, nor was there any evidence that she substantially participated in the decision-making, or that Mr. Jen knew of or was aware of any comments by Ms. Lynch, even assuming those statements were made, which she denies, but let's even assume they were made. There's no evidence, and therefore I think there's long precedent in the Sixth Circuit that those are stray remarks under the, if you go through the analysis under an age discrimination claim, that at most those are stray remarks, unattributable to a decision-maker, didn't play any role in the decision. In terms of the conduct and the comparator, what I find interesting is that appellant completely ignores the and focuses on Brian Parris, completely ignores that there are actually two complaints that were made prior to his termination. One, you've got the Parris complaint, but earlier, plaintiff admits, and this is in the record at 64-8, page 1187 to 1188, record 63-6, page 943, 11 to 19, but there were two complaints. One complaint was by Rob Doyle, another member of the staff under Mr. Heber, about his statements about unionization, and he was kind of cut off funding, because a union had been created in the year or so prior to Mr. Heber's termination. The workforce got unionized, and so employees felt more comfortable bringing their complaints forward, and I think that's in part what happened here. On that basis alone, added to the fact that Mr. Heber is the top tax man in Oakland County. He is the tax man. He's the guy who decides what property values are within the entire county of Oakland, which is, by most accounts, the fifth wealthiest county in the country. So he was a top-level official. To compare him and his conduct to say that a lower-level person who may supervise one or two employees is a proper comparator, I just think is inapt and not supported by the case law within the Sixth Circuit. Last, the Loudermill issue. From the question, I think the panel recognizes that Mr. Heber, the due process afforded him, went above and beyond. He had the informal meeting. It's in the record, 64-16, starting at page 1388. He was interviewed with his attorney, with counsel, where they went through everything. It's like a 25-page transcript. It's attached, where he had the opportunity... Yeah, they presented and they talked about the issues in general, which under Loudermill, at a pre-termination hearing, when there was a full possibility for a full evidentiary hearing, which here is the case under the Personnel Appeals Board, they went above and beyond. Because they went... The notice of what was supposed to be the pre-termination hearing indicated that there were, I can't remember the number, either 9 or 11 statements that had been taken. Was that presented to him prior to the interview or during the interview? The November 12th interview? Yes, the one that took place shortly before... Before the November 23rd pre-termination hearing. I'm not referring to what was going to be the formal hearing. The notice for the formal pre-termination hearing indicated... I'm sorry, Judge. I don't mean to interrupt. The notice indicated that there were these interviews and these statements taken. My question is, going back to the interview, was he provided that evidence that there were these 9 statements or witness interviews? If you read the transcript, yes, he was addressed during that interview on November 12th. The process that you have to remember is he was placed on administrative leave during an initial meeting with HR. During that meeting, Mr. Heber admits that the HR rep told him that it was based on his statements about union conduct, as well as the diversity survey. He admits he was told both of those things on the day he was placed on administrative leave. After that, a week or so later, he has this meeting with HR and an attorney for the county, and his attorney, they sit down, it's recorded, it's part of the record. He is asked specifically about some of those statements that are listed then later in the pre-termination hearing. He was asked whether he made the statements, right? Correct. So did they tell him what evidence they had against him that, in fact, he had made the statements? They said that they talked to witnesses. Did they say who the witnesses were? During that hearing, I'm not sure. No, not a hearing. I'm talking about the interview. During the interview, no, I don't believe they told him. Okay, so he is not told the evidence against him. He's only asked whether he made these statements, and he said, no, I did not make the statements. All right, I think he has to be advised of the evidence against him. He also has to have notice of the charges against him. I think here, isn't he terminated for creating a hostile work environment? Isn't that the charge? Okay, at the interview, was he told that he is charged with creating a hostile work environment and whatever else you said right there? Correct. Was he told those are the charges? At the interview. At the interview, he was told... Yes or no, was he told those two things? Yes to the first, the second... Yes to the first, he is told that he is charged with creating a hostile work environment. Where is that in the transcript? That is in the record at... I don't think he was. I think he was told, did you make these statements? But he wasn't told of what charge arose from those alleged statements, that's all. I don't think he knew that he was being charged. Okay, and maybe I think this is a difference in semantics, and I would say, Your Honor, that at the November 12th interview, the interview, they told him of the allegations. They told him of the statements. And he denied those. He did not tell him you are charged with creating a hostile work environment. And then they did not give him the evidence that they had that he created a hostile work environment. They only asked him, did you make these statements? He said no, well, then he assumes there is no evidence. Okay, then even if you assume that that didn't satisfy... I do assume that. Okay, let's assume that. He was then given the letter that detailed the evidence and the charges prior to the pre-termination hearing. Okay, and at the pre-trial hearing, I mean, under... The requirements are that he has to be given notice of the charges, notice of the evidence, and an opportunity to rebut the charges. And I don't think there's any dispute that at the pre-termination hearing he was not given an opportunity to rebut the charges because they told him this is not the time to plead your case. So that does not satisfy it, I don't think. I would disagree with that statement, because if you actually read the full email chain, they pluck and cherry pick one statement. At the time that statement was made, he was already interviewed and asked about all the questions. They told him he'd be receiving the formal notice. He received a formal letter, a two-page letter, that detailed the charges, detailed all the statements, said we interviewed 11 people. Here are some of the statements that we're basing this on, and you have a right to appear tomorrow. And they attached to it all the pre-trial hearings. And back and forth, if you read the email that the statement that you referenced is made, it's about the fourth email back and forth. But what was said at the hearing, I thought when they were saying you can respond, it's like I was told this is not the time to respond. And the hearing officer said you're right, this is not the time to respond. That's incorrect? Because that's my recollection. I believe that the difference is it was not the, they were asking for, they wanted to call witnesses, they wanted documents, they wanted all those things at the pre-termination hearing. What they were saying is this is not the time, the context, and if you read it, the context is, and if you read the actual testimony of the HR representative Wood, which again is in the record below, asking her about that, it was in response to plain-and-simple questions. It was a defense attorney trying to turn the pre-termination hearing into what would be afforded later at the personnel appeals board. What words were exactly said at that point, at the pre-termination hearing, about this is not the time to plead your case? What exactly do you admit was said? I don't have that quote. You don't have the quote? You really should have the quote. I understand and I apologize, Your Honor. Okay, isn't there at least a genuine issue of material fact of whether he was given a chance at the pre-termination hearing to rebut the evidence? Isn't there at least a genuine issue of material fact which precludes summary judgment at this point? I don't believe so because there's a... You're arguing these statements can be interpreted one way. Can I make a suggestion for you that might help a little bit in responding to Judge Griffin? That would be great. I appreciate this. One thing you might try to do is to say, are there any cases that say these kinds of exchanges suffice under Laudermill? There are cases and we did cite them in our brief. Is there one or two that really illustrate why this suffice? And if they're not, we'll figure it out. But I think you get his point that they didn't give him the backup for why allegedly the statement was said, who said it, when, and so forth. That's what he's pointing out. And if there's a case that says under Laudermill, what they did is all you have to do, that would help. Yeah, I believe the McDaniel v. Princeton City School Board case, 6th Circuit, 2002, 45F, Appendix 354. In that case, it's different that they discharged the teacher because not all of the teachers in that case had a backup. The evidence was provided, not all the charges. In this case, the charges and the statements were there. Wait, so that's one where we found it wasn't sufficient under Laudermill? Correct, but I'm just pointing out that I would distinguish in this case, we did satisfy all the things that they said were missing there. That's a dangerous form of argumentation. I understand, Your Honor. I feel like I'm, I was trying to get you out from underjudgment. Yeah, I understand. But I've made it worse. I understand, Your Honor. If I could just close briefly. The cases cited in our brief clearly establish that the standards and the precise language that has to be used in a pre-termination hearing when there is a full evidentiary hearing afterwards. Those cases establish that I think some of the nuance that Judge Griffin and I were getting into in terms of what the precise language was stating, I don't think there is magic language or magic statements that have to be made to satisfy the due process requirements. And that is the point that I was trying to make and probably got into the weeds a little bit too much with Judge Griffin. Very good. Thanks very much. We'll hear rebuttal.  Thank you, Your Honor. Just to clarify what was said. So in a November 22, 2021 email, Ms. Wood from HR told Mr. Heber's attorney, quote, the hearing that is taking place is brief to inform Mr. Heber of the notice of being terminated and to provide the department's cause. Also, this is not the time that Mr. Heber would plead his case. That would be done afterward through the personal appeal board. Okay. At the hearing then, Mr. Heber said, I deny the charge. I was informed that the termination was a predetermined outcome of this meeting. Let's just pause right there. He says that. They don't deny it. And 17 minutes after the hearing, he's terminated. Why doesn't he pursue this afterwards? Why does he abandon the post-termination? Can I just finish what was said to him just to answer Judge Griffin's question and then come back to that? Because they say, because Ms. Fisher, now who is reporting directly to Ms. Lynch, is saying that if he wants the challenge, the action being taken, he has the right to do so through the personal appeal board. Today's meeting is just to make sure that he is aware of the action being taken and understands the reason why. They have a fundamental misunderstanding as to what happens at a pre-termination hearing. They don't think there's a right to reply. There is. To answer your question, because it was a sham. And what happens? We're going to have the personal appeal board. Mind you, the defamatory emails... I'm just out of curiosity. I'm not expecting you to know this case, but if you do, I'd just be curious. Are you aware of a case where someone succeeded on their Laudermill pre-termination claim, but had ultimately abandoned a hearing afterwards? That just seems a little incongruent. It doesn't seem like you have a whole lot of conviction about this process. When you're given a full hearing later and you say, I don't think so. Do you have a case where that happened? I don't off the top of my head. No, I don't. I'm also not sure what your damages would be, that you're given a post-termination hearing that, well, at least you abandoned it, so we assume that it was adequate. So you have a technical violation of due process in the pre-termination process. But are there damages in between or something? Well, I don't know. If it's improper, he's denied his constitutional right to process. So why wouldn't he be able to get money damages for the... I'm not sure what your damages are, that's all. I agree that you would have a claim. I just don't know what the value would be or what... Say we remand it to allow you to proceed with the pre-termination due process claim. I just don't know what the end result's going to be here, that's all. I guess you're entitled to attorney fees for one, but what are the... Only if you get them under... I don't know. I don't know, but I don't know that that issue's reserved for this appeal. It is not. But the point I want to make is that we went through the PAB, we tried to. And so what happens beforehand? You have all the witnesses have been told they can't talk to Mr. Heber beforehand because of the emails that were sent out. You have the retirees that were witnesses that they've had to sign, if they want their retirement benefit, they have to sign away a settlement agreement that releases them from liability and promises that they won't disparage the county. Okay, and what are they going to do? Come in here and disparage the county? They're not going to risk that. So you have that. But wouldn't these things strengthen your post-termination due process claim if you finish the process? These issues you're saying attorneys will call witnesses and subpoena and do those things. But at some point a process becomes so unfair that you don't have to continue it. Okay, and you look at, you know, he wasn't, they say we can't subpoena witnesses. Yes, you can. These are employees. If you don't show up at the hearing, you're going to be disciplined for insubordination. They can order that. They didn't. We submitted affidavits of people because we couldn't get them to appear. Just out of curiosity, I don't, tell me if I'm wrong about this, but I'm not sure Loudermill requires No, we're at post-deprivation. I'm making the point, though, if you don't have a right to subpoena witnesses before termination, and then when you do have that right after and you don't use it, that seems funny to me. Right. I mean, they're not giving him a full hearing. Why wouldn't they subpoena the witnesses? We asked for people to be subpoenaed. They weren't. No, but I mean, tell me if I'm wrong. I thought Loudermill would not require a right to subpoena witnesses before termination. As long as you have the right after, we're okay, right? Right. That's the whole idea, is that Loudermill is sufficient if the post-termination or post-deprivation process is sufficient. One of your complaints about what happened before termination was not having witnesses. And it's just really funny that you don't get that under Loudermill. That's your claim. You're saying you win on summary judgment, but then the time you get it, you don't exercise it. We try to. They said, the first thing they said, we can't, we don't subpoena. We cannot subpoena witnesses when the rules say that they can, and they clearly can order employees to... Your reason for abandoning the post-Loudermill hearing was that they weren't letting you do what you're supposed to be able to do? One of them, yeah. Very much so. They said we can't subpoena witnesses. It's right in their rules. They said, well, we don't have a court order. Okay. Put an instruction in. You have the power of discipline. It's insubordination if you don't... They didn't do it. We didn't have the witness statements and all these things. We asked for all these documents. We didn't get them. We were concerned. We brought up concerns about interference with witnesses because of the letter, because of the settlement agreements. Oh, don't worry, we'll make sure we don't interfere with anything. We just have to trust them when they've already violated his rights, when they've already defamed him and all this stuff. So you have then, why is the, again, the number two person in the county so excited that about one of the community members is selected to be on the board? Why would she be that excited? Does that raise an issue about impartiality? It absolutely does. Why is the panel supposed to be composed of six members? We only had three. And two of those members are supposed to be employees. We didn't have that. The red light's been on for a little while, so if you have one last point... There's multiple reasons why we thought it was a sham. I think that it was a sham that was going on and we don't have to continue forward with that when we're not getting his rights and they've not respected his rights before. Thank you very much for your briefs and your arguments. Thank you.